IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION           2018 SEP 24   PM 4: 37

| | |
|---|---|
| MARIA M. ROSAS, ) | |
| ) | |
| Plaintiff, ) | CASE NO.: 1: 18-cv-05340 |
| ) | |
| vs. ) | |
| ) | HON. GARY FEINERMAN |
| ) | |
| CHICAGO POLICE ) | |
| DEPARTMENT, and agency ) | |
| of the City of Chicago, ) | FILED |
| ADVOCATE CHRIST MEDICAL ) | |
| CENTER, a Cook County ) | SEP 24 2018 |
| Hospital, ) | |
| MacNEAL HOSPITAL, a Cook ) | THOMAS G. BRUTON |
| County Hospital, and ) | CLERK, U.S. DISTRICT COURT |
| MADDEN MENTAL HEALTH ) | |
| CENTER, a State of Illinois ) | |
| Hospital, ) | |
| ) | |
| Defendants. ) | JURY DEMAND |

## SECOND AMENDED CIVIL COMPLAINT

**Preliminary Statements**

1. Plaintiff María M. Rosas ("Plaintiff") brings this action under the Civil Rights Act, 42 U.S.C. § 1983, 1985, 1986.

2. Plaintiff alleges that Defendants Chicago Police Department, Advocate Christ Medical Center, MacNeal Hospital, and Madden Mental Health Center discriminated against her based on her race, color, national origin, and disability when

they conspired with others and each other to involuntarily institutionalize her at Madden Mental Health Center.

3. Plaintiff alleges that her daughter returned to live with her in 2014.

4. On December 27, 2016, Plaintiff filed a petition for a Civil No Contact Order against James O'Connell ("O'Connell"), the neighbor north of her house. Plaintiff alleged that O'Connell terrorized her when she was on her property and doing things that he did not like, to the point that she feared for her safety. Her daughter assisted in filing the Order.

5. Around that time, Plaintiff's daughter asked if O'Connell had anything to do with her being committed to Madden Mental Health Center in the past. Plaintiff alleges she did not know.

6. With assistance from her daughter, Plaintiff began requesting all records leading to her being committed to Madden Mental Health Center in 2009 and 2010.

7. Plaintiff received the records and her daughter translated them into Spanish for her.

8. Plaintiff alleges that Defendants Chicago Police Department, Advocate Christ Medical Center ("Advocate Christ"), MacNeal Hospital ("MacNeal"), and Madden Mental Health Center ("Madden") conspired with her neighbors and each other to involuntarily institutionalize her while lacking completed medical certificates or court orders.

9. Plaintiff's records also included documents where she informed medical personnel at Madden that she did not want to be there. Plaintiff alleges that medical staff

and personnel insisted that she had to be there and she was led to believe that she was there legitimately.

10. Plaintiff alleges that from December 2016 to January 2017, she learned that she had been at Madden illegally.

11. Plaintiff further alleges that medical staff and personnel at Madden were unfamiliar with her culture, and records show that medical personnel increased her psychiatric medications as a result.

12. Plaintiff also alleges that it was not until she almost fainted at Madden that she received medication for her high blood pressure.

13. Plaintiff alleges that Madden did not alleviate her depression after she was released from its facility. On the contrary, Defendant Madden exacerbated her depression.

14. Plaintiff also alleges that as a result she developed a heightened fear of doctors.

15. Defendants Chicago Police Department, Advocate Christ, MacNeal, and Madden violated Plaintiff's civil rights based on her race, color, national origin, and disability.

16. For reasons outlined above, Plaintiff files this complaint with assistance from her daughter.

## PARTIES

17. Plaintiff María M. Rosas is a resident of this district.

18. Defendant Chicago Police Department, an agency of the City of Chicago, has an address of 3510 S. Michigan Ave., Chicago, Illinois 60653.

19. Advocate Christ Medical Center, a subsidiary of Advocate Health Care, has an address of 4440 W. 95th Street, Oak Lawn, Illinois 60453.

20. Defendant MacNeal Hospital, a subsidiary of Loyola Medicine/Trinity Health, has an address of 3249 S. Oak Park Avenue, Berwyn, Illinois 60402.

21. Defendant Madden Mental Health Center, a State of Illinois hospital, has an address of 1200 South 1st Avenue, Hines, Illinois 60141.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to the Civil Rights Act 42 U.S.C. §§ 1983, 1985, and 1986.

23. Venue is proper under 28 U.S.C. §§ 1331.

## FACTUAL ALLEGATIONS

24. When Plaintiff was committed to Madden Mental Health Center in 2009 and 2010, her neighbor to the south was David Striegel ("Striegel"), a police officer with Defendant City of Chicago. The neighbor to the north was—and currently is—James O'Connell ("O'Connell"), the brother of Donald O'Connell who was—and currently is—the 13th Ward/13th Precinct Captain and a Commissioner with the IL Liquor Control Commission. Both Striegel and O'Connell are White/Anglo/Caucasian.

25. In 1990, Plaintiff and her husband purchased their home in part because it did not have any trees around it. After O'Connell and his family moved-in, he planted a tree in their front yard. The tree has grown over the years, as do the amount of leaves and

4

dead branches it produces. Plaintiff alleges that the O'Connell seldom rakes "the garbage" his tree produces and opts instead for it to blow away onto her property.

26. Plaintiff is tired of having to rake leaves and dead branches for a tree that is not hers. In 2016, Plaintiff began using her blower to blow the leaves onto the street and onto O'Connell's property. This was when she alleged O'Connell began screaming at the top of his lungs using statements such as "son of a bi*ch," "fu**ing sh*t," "get out of [outta] here." Every time O'Connell began his terrorism, Plaintiff further alleges that she feared that the 300-pound man would harm her so she would rush inside her home.

27. Plaintiff alleges that O'Connell has had a history of harassing her and her late husband. O'Connell ordered her husband not to park his old van in front of the house because it did not look nice. O'Connell also ordered her husband not to fix his van in the alley, even when her husband was on his property.

28. After her husband died, Plaintiff alleges that O'Connell began terrorizing her.

29. Initially, the Plaintiff alleges that she would ignore O'Connell. But when he began scaring her, the Plaintiff, with assistance from her daughter, investigated her legal rights.

30. The Plaintiff alleges that James O'Connell was home all day and he monitored when her daughter was not home so he could terrorize her.

31. The Plaintiff began documenting the acts of terror by James O'Connell in December 2016. On December 27, 2016 and after two acts, Plaintiff, with assistance from her daughter, filed for a Civil No Contact Order ("CNCO") with the Circuit Court of Cook County. The Court dismissed the case and instructed them to return if the acts

5

continued. Plaintiff alleges that they did.

32. During the hearing on April 14, 2017 at 9 a.m., O'Connell was not in court. The Court issued a judgment in default and ordered the Civil No Contact Order against O'Connell. While the Plaintiff and her daughter waited for court documents, O'Connell arrived at 9:40 a.m. O'Connell's attorney claimed that they had been "on the wrong floor" and the Court recalled the case. Not only did the Court accept O'Connell's excuse for being 40 minutes late, it recalled a case for which it had already issued an order.

33. The aforementioned on Plaintiff's neighbors serves to highlight (1) the O'Connell's privilege and (2) Striegel's gratitude to O'Connell, the person directly responsible for Striegel getting into the Chicago Police Academy. In hindsight, Plaintiff alleges that this privilege and gratitude was what initiated the conspiracy against her.

34. From December 2016 to January 16, 2017, Plaintiff received medical records from Defendants Advocate Christ Medical Center ("Advocate Christ"), MacNeal Hospital ("MacNeal"), and Madden Mental Health Center ("Madden").

35. Plaintiff received copies of the Patient Care Reports from the Chicago Fire Department ("CFD") on March 08, 2017.

36. On <u>September 06, 2009</u>, CFD's "findings" when paramedics arrived at scene at 4:12 p.m. were: For <u>GCS</u>, "Score was 15, Eyes: 4-spontaneous, Verbal: 5-oriented, Motor: 6-obeys commands".

37. For "care events," Plaintiff's <u>Vitals</u> were "Pulse: 82, BP: 160-90, RR: 18" and her <u>Bloodsugar</u> was Blood Sugar: 191".

38. CFD's "results" read:

6

> [unreadable] summary called for above patient who PTOA was found seated in her auto reving [sic] engine refusing to get out. CPD on scene PTOA broke passenger window and shut car off. Per CPD patient kept trying to re-start car and take-off. Per neighbors[,] patient has been acting strange x all day by taking garbage to can in the alley, and then bringing it back in[. P]er neighbors[,] patient has been throwing rocks at houses and parked cars. CPD [unreadable] on scene wishes patient transported to ER for psych eval. Patient placed in position of comfort and transported to CHMC for evaluation, all time approx. (modified original in all caps).

The notes also state that Plaintiff was unable to sign due to her "mental status." Plaintiff was transported to Defendant Advocate Christ.

39. On March 21, 2017, Plaintiff received copies of the Incident Reports from Defendant Chicago Police Department ("CPD").

40. For the incident on September 06, 2009, the narrative of the handwritten CPD Original Case Incident Report with a time of 4:03 p.m. read:

> [illegible] #04180 In summary, R/Os responded to SUSP AUTO at said location, in that subj was sitting in her vehicle for at least 15 minutes continually reving [sic] her engine. Upon arrival[,] R/O's observed subj to be distraught + not responding to verbal commands. R/O's repeatedly ask [sic] subj to open veh door + turn vehicle off, in which she did not respond to any verbal commands. R/O's broke out back window of said mentioned vehicle to make entry, in fear of subj hurting herself, or someone else. Amb #54 responded + transported VIC to Christ Hosp. VIC was treated by Dr. Kulstad + held for MENTAL evaluation. R/O's attempted to notify VIC's son, R/O's left message on son's phone BT 820[.]

41. Plaintiff arrived at Defendant Advocate Christ's ER at 4:40 p.m.

42. On January 16, 2017, Plaintiff received a CD with her medical records from Defendant Advocate Christ.

43. According to Defendant Advocate Christ's Emergency Department Documentation ("EDD"), Plaintiff was examined on September 06, 2009 at 5:55 p.m. The "Chief Complaint: CC: psych eval" read:

7

Pt brought to ED after she was found sitting in her car revving the engine. Pt's neighbors said she was throwing rocks at cars and houses. She has been displaying other strange behavior like taking trash to garbage and then back into house. Pt arrived in ED stating she doesn't speak English but EMS reports that she is fluent in English. Pt reports that someone covered her mouth and she passed out, thinks she might have been raped. No vaginal trauma, bleeding, or memory of event. Pt denies rape in her attic, doesn't remember saying that. Denies SI/HI hallucinations. (06:01 CKul (p. 1).

44. The Doctor Notes read:

Text: will perfom pelvic exam once pt in room, but doubt rape occurred given poor history, delusional behavior. commital [sic] as unable to care for self. (6:07 CKul)
Patient endorsed to me by Dr. Kulstad, plan for transfer to state facility under certificate (completed by Dr. Kulstad) after medical clearance. Lab results and CT reviewed; no significant abnormalities. Cleared for psych transfer. Son here; reviewed with him patient's presentation; he last saw her yesterday and says she was acting normally then and has no previous psych history. (13:58 AC15)
62 yo f with new acute onset psychosis in sign out from Dr. Girzadas, medically cleared and awaiting transfer. (Mon Sep 07, 2009 07:01 MIF) (p. 2).

45. Plaintiff alleges that Dr. Girzadas entered no notes on the EDD for the diagnosis.

46. On September 07, 2009 at 7:30 a.m., the EDD stated, "Pt [Plaintiff] states that she wants to go home" (p. 10).

47. Then at 11:06 a.m., the EDD stated, "Pt agrees to inpt psych admission at state hospital as referred by ER MD." (p. 11, modified original in all caps).

48. At 11:17 a.m., the EDD stated that Plaintiff denied any suicidal or homicidal ideations (p. 13).

49. Plaintiff alleges that the EDD and the medical records from Defendant Advocate Christ did not include a completed doctor's certification or any court documents for an involuntary commitment for her.

8

50. Heather Namors, *LCPC* with Defendant Advocate Christ, signed an incomplete "Petition for Involuntary/Judicial Admission" for Plaintiff dated September 06, 2009.

51. On December 05, 2016, Plaintiff went to Defendant Madden to request copies of her medical records. Plaintiff received them around December 13, 2016.

52. On March 08, 2017, Plaintiff sent a request for the "'legal papers' used to admit patient" in 2009 and 2010. Plaintiff received them around March 31, 2017.

53. As a patient who allegedly exhibited "delusional behavior" (CKul at 06:07, September 06, 2009, Advocate Christ Medical Center, EDD, p. 2), Plaintiff signed paperwork on her own behalf at Defendant Madden on September 08, 2009 *and* she signed the majority of the paperwork in the English language.

54. Plaintiff alleges that she is a native Spanish speaker and has beginning proficiency in the English language.

55. Plaintiff signed an "Application for Voluntary Admission," and "Reaffirmation of Voluntary Status."

56. On the "Initial Psychiatric Nursing Assessment", the nurse wrote that Plaintiff stated "I don't know why I'm here" (p. 5).

57. On September 23, 2009, the nurse wrote "I don't want [to] sign until I know when I'm going home" on the "Master Treatment Plan" (p. 9).

58. On October 07, 2009, the nurse wrote Plaintiff's comments such as: "when can I go home" and "I don't want to sign until I know when I'm leaving" on the "Master Treatment Plan" (p. 9). That same day on the "Treatment Plan Review", for

9

<u>Patient input into treatment plan</u> the nurse wrote "I want to know when I can go home" as Plaintiff's input.

59. Plaintiff alleges that notes taken by medical staff and personnel with Defendant Madden during her hospitalization point to their hostility towards her cultural practices. She further alleges that the hostility resulted in being administered higher doses of medications.

60. Plaintiff was discharged from Defendant Madden on October 15, 2009, over a month after being committed, being heavily medicated, and receiving no personalized psychological treatment.

61. Plaintiff was committed to Defendant Madden again the following year.

62. On <u>June 01, 2010</u>, CFD's "findings" were: For <u>GCS</u>, "Score was 15, Eyes: 4-spontaneous, Verbal: 5-oriented, Motor: 6-obeys commands".

63. For "care events," Plaintiff's <u>Vitals</u> were "Pulse: 108, BP: 140-90, RR: 28, Sp02%: 100" and her <u>Bloodsugar</u> was Blood Sugar: 115".

64. Defendant CFD's "results" read:

> Found 63yr/o female walking out of car repair/body shop crying with E127. Pt c/o pain all over which started after pt was arrest [sic] for vandelizing [sic] cars in the body shop. Pt does not have a car in the shop but she walked in and started scratching up and damaging cars. A&OX' S3 BLS above. Transported [to MacNeal Hospital] without incident.

65. On June 01, 2010, the narrative of the printed CPD Original Case Incident Report with a time of 3:38 p.m. read:

> [Redacted name], (witness/owner for Airport Auto Rebuilders) related to R/Os that after reviewing their video recording they learned that on 29 May 2010, Plaintiff Rosas(offender) walk [sic] by [redacted name](victim) parked vehicle and scratched it on rear right side quarter panel and rear trunklid [sic] with her keys. On today's date while [redacted name](victim) was inside the business[,] they observed Plaintiff Rosas

10

> (offender) walking past listed location wearing the same clothes that she wore on the day of incident. [Redacted name](witness) stopped her and held her for CPD. Upon R/O's arrival[,] Plaintiff Rosas(offender) advised that she had health & mental problems. Plaintiff Rosas(offender) then requested medical attention for chest pain and was transported to MacNeal Hospital by CFD 21. MacNeal Hospital advised that Plaintiff Rosas(offender) would be treated for chest pain and would undergo a mental evaluation. Plaintiff Rosas…(offender) [was] treated by Dr. Henry @ MacNeal Hospital. [Redacted name](victim) given V.I.N., advised to obtain a warrant and to pursue civil litigation./Inventory no. for video recording 12032056/Reporting Officer – Star#: 1661 Name: Juan Santiago Beat: 0825 (modified original in all caps).

Plaintiff alleges that she never said that she "had health & mental problems."

66. Plaintiff arrived at Defendant MacNeal's ER at 4:22 p.m.

67. On December 09, 2016, Plaintiff went to Defendant MacNeal and obtained copies of her medical records.

68. The "Emergency Department History, Physical and Treatment" ("EDSPT"), an electronically verified report by Shelise M. Henry, M.D., stated that the "Chief Complaint: [was] vandalizing body shop" (p. 1).

69. The EDSPT also stated that Plaintiff did not have any suicidal or homicidal ideations (p. 1).

70. It further stated:

> CONSULTED (SOAPQ Hand-Off Communication): BHS Social Worker in personSpoke [sic] to patients [sic] daughter who states that she was here visiting in May[.] [D]uring the visit, pt stated several times that she was depressed and wanted to end her life at 08:03 pm[.] (ibid).

Plaintiff alleges that her daughter never visited her in May 2010.

71. A nurse signed on Plaintiff's behalf agreeing to be transferred to Defendant Madden.

11

72. An LCPC and Social Worker with Defendant MacNeal signed an incomplete "Petition" for an involuntary commitment to a mental health facility for Plaintiff dated June 02, 2010.

73. Dr. Henry at Defendant MacNeal signed an incomplete "Certificate" on Plaintiff on June 01, 2010 at 8:05 p.m.

74. Plaintiff refused to sign the "Consent for Services" form in English *and* Spanish on June 02, 2010 at 5 p.m.

75. Dr. Garb at Defendant Madden signed an incomplete "Certificate" on Plaintiff on June 02, 2010 at 6:54 p.m.

76. Plaintiff signed an "Application for Voluntary Admission" on June 04, 2010 at 11:40 a.m.

77. Plaintiff signed a "Petición para darle de alta"/*Petition for Discharge*, on June 04, 2010 at 11:45 a.m.

78. Plaintiff was discharged from Defendant Madden until June 09, 2010.

79. In 2009, Plaintiff was hospitalized with Defendant Madden Mental Health Center because she was, in part, damaging private property. However, Plaintiff alleges that no one *ever* filed civil lawsuits for damage to their houses and/or cars incurred that year and that she was *never* cited for disturbing the peace.

80. After CFD paramedics took Plaintiff to Defendant Advocate Christ, she alleges that Striegel called her son to inform him that he had called for an ambulance for his mother.

81. Plaintiff alleges that she was warming her car when Defendant Chicago Police Department arrived. In fear of them, she did not want to exit her car. Defendant

12

Chicago Police Department broke Plaintiff's window and forcefully removed her from the car.

82. Plaintiff alleges that Striegel maliciously made the 911 call by fabricating allegations against her.

83. Mark Zoller, ("Zoller"), the "witness/owner" of Airport Auto Rebuilders Inc. *never* obtained "a warrant," as suggested by Defendant Chicago Police Department, nor did he file a civil lawsuit against Plaintiff for the alleged damage caused to a vehicle in 2010. Zoller is also White/Anglo/Caucasian.

84. On May 07, 2014, both the Plaintiff and her daughter went to Defendant Chicago Police Department, District 8, to file a complaint against Zoller. The Original Case Incident Report read:

> Event #12267 In summary, victim stated that as she was walking at above location [Mark Zoller,] the owner of Airport Auto Rebuilders came out and began to yell at victim. Victim stated that offender told her that she could not walk in front of this location [4901 W. 63rd Street, 60638]. Offender then began to follow victim as she walked and continued to yell. Victim then crossed the street to get away from subject due to victim being placed in fear of recieving [sic] a battery. VIN given

85. Plaintiff alleges that her daughter was with her the day of the incident.

86. Plaintiff alleges that she was not visited by Defendant Chicago Police Department, and did not receive any phone calls or mailings either.

87. Plaintiff alleges Zoller and O'Connell have been acquaintances for years. O'Connell organized the "63rd and Lavergne" summer block parties and during activities, he would distribute gift certificates sponsored by Zoller and others.

88. Plaintiff alleges that Defendant Madden did not alleviate her depression, but exacerbated it. Most of her family—including her own mother—disowned her for

having been committed to a mental health facility on two occasions and deemed her as "crazy."

89. After having been committed Plaintiff also alleges that she was left with a heightened fear of doctors, which has prevented her from seeking the medical attention she needs.

91. Defendant Chicago Police Department, by way of its police officers, was obligated to enforce the law. Instead, its police officers conspired with Striegel, an off-duty police officer, to negligently, maliciously, willfully, and knowingly violate Plaintiff's civil rights because of her race, color, national origin, and disability.

92. Defendants Advocate Christ, MacNeal, and Madden were obligated to provide a duty of care to Plaintiff, a patient under their care and control. Instead, they conspired with Plaintiff's neighbors and each other to negligently, maliciously, willfully, and knowingly violate Plaintiff's civil rights because of her race, color, national origin, and disability.

## CAUSES OF ACTION

### COUNT 1 – 42 U.S.C. §§ 1983, 1985, 1986
### Conspiracy to Deprive Constitutional Rights

93. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

94. Police officers with Defendant Chicago Police Department, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to exaggerate and fabricate allegations against her and thereby deprive her of her constitutional rights, all as described in the various paragraphs of this Complaint.

14

95. In doing so, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means.

96. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

97. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's innocence.

98. As a result of Defendant Chicago Police Department's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count II – 42 U.S.C. §§ 1983, 1985, 1986
### Failure to Intervene

99. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

100. In the manner described above, during the constitutional violations described herein, Defendants Advocate Christ Medical Center, MacNeal Hospital, and Madden Mental Health Center stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

101. As a result to the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as added emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

102. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, MARIA M. ROSAS respectfully requests that this Court enter judgment in her favor and against Defendants ADVOCATE CHRIST MEDICAL CENTER, MacNEAL HOSPITAL, and MADDEN MENTAL HEALTH CENTER, awarding compensatory damages, attorney's fees and costs against each Defendant, punitive damages against each Defendant, and any other relief this Court Deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff MARIA M. ROSAS hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Plaintiff,
By *Pro Se*,

Dated: 09-24-18          By: *María M. Rosas*
                         María M. Rosas
                         Plaintiff
                         6333 S. Lavergne Ave.
                         Chicago, IL 60638
                         Telephone: (773) 884-2140
                         E-mail: irmarosaswebsite@gmail.com

CERTIFICATE OF SERVICE

I, María M. Rosas, Plaintiff Pro Se, do hereby certify that on the 24 Day of September, 2018, a true and correct copy of the foregoing Second Amended Complaint of Plaintiff, María M. Rosas, was forwarded to Defendant Madden Mental Health Center by U.S. First Class Mail at the following address: 1200 South 1st Avenue, Hines, Illinois 60141.

María M. Rosas, Pro Se
6333 S. Lavergne Ave.
Chicago, Illinois 60638
773-884-2140
irmarosaswebsite@gmail.com

Dated: 09-24-18

María M. Rosas

CERTIFICATE OF SERVICE

I, María M. Rosas, Plaintiff Pro Se, do hereby certify that on the 24 Day of September, 2018, a true and correct copy of the foregoing Second Amended Complaint of Plaintiff, María M. Rosas, was forwarded to Defendant MacNeal Hospital by U.S. First Class Mail at the following address: 3249 S. Oak Park Avenue, Berwyn, Illinois 60402.

                                              María M. Rosas, Pro Se
                                              6333 S. Lavergne Ave.
                                              Chicago, Illinois 60638
                                              773-884-2140
                                              irmarosaswebsite@gmail.com

Dated: 09-24                           *María M. Rosas*
                                         María M. Rosas

CERTIFICATE OF SERVICE

I, María M. Rosas, Plaintiff Pro Se, do hereby certify that on the 24 Day of September, 2018, a true and correct copy of the foregoing Second Amended Complaint of Plaintiff, María M. Rosas, was forwarded to Defendant Advocate Christ Medical Center by U.S. First Class Mail at the following address: 4440 W. 95th Street, Oak Lawn, Illinois 60453.

> María M. Rosas, Pro Se
> 6333 S. Lavergne Ave.
> Chicago, Illinois 60638
> 773-884-2140
> irmarosaswebsite@gmail.com

Dated: 09-24-18

_María M. Rosas_
María M. Rosas